[No. B227000. Second Dist., Div. Three. Feb. 1, 2012.]

JOHN MAXTON, Plaintiff and Appellant, v.
WESTERN STATES METALS et al., Defendants and Respondents.

84

## COUNSEL

Metzger Law Group, Raphael Metzger, Greg Coolidge and Carmen Yates for Plaintiff and Appellant.

Grodsky & Olecki, Allen B. Grodsky and Courtney Puritsky for Defendant and Respondent Böhler-Uddeholm Corporation.

Wood, Smith, Henning & Berman, David F. Wood, Patrick S. Schoenburg and Mark J. D'Argenio for Defendant and Respondent TW Metals, Inc.

McKenna Long & Aldridge, Wayne S. Grajewski and Andrea T. Prohaska for Defendants and Respondents Reliance Steel & Aluminum Co. and Earle M. Jorgensen Company.

Barg Coffin Lewis & Trapp, Richard C. Coffin, Donald E. Sobelman, Laura S. Bernard and Nicole M. Martin for Defendant and Respondent The Boeing Company.

Blakeley & Blakeley, Bradley D. Blakeley and Brooke R. Sanita for Defendant and Respondent Metal Supply, Inc.

Poole & Shaffery, John H. Shaffery, John F. Grannis and Rey S. Yang for Defendant and Respondent Western States Metals.

Schiff Hardin, Jeffrey R. Williams and Nicole S. Magaline for Defendants and Respondents A.M. Castle & Co. and Castle Metals Aerospace.

Burke, Williams & Sorensen, Ronald F. Frank and Keiko J. Kojima for Defendant and Respondent Fry Steel Company.

Lewis Brisbois Bisgaard & Smith, Judith A. Zipkin and Jeffry A. Miller for Defendant and Respondent Rolled Alloys, Inc.

Gordon & Rees, P. Gerhardt Zacher and Matthew P. Nugent for Defendant and Respondent Alcoa, Inc.

Walsworth Franklin Bevins & McCall, Deidre Cohen Katz, Christopher M. McDonald and Jonathan S. Gulsvig for Defendant and Respondent Hi-Temp Metals, Inc.

Wilson Elser Moskowitz Edelman & Dicker, Thomas C. Corless and Josephine C. Lee-Nozaki for Defendants and Respondents Joseph T. Ryerson & Son, Inc., and Ryerson Inc.

No appearance for Defendant and Respondent Resco Products, Inc.

---

**OPINION**

**KITCHING, J.**—Plaintiff John Maxton alleges he sustained personal injuries as a result of working with metal products manufactured by defendants[1] and supplied to Maxton's employer. The metal products were essentially raw materials because they could be used in innumerable ways. The issue on appeal is whether Maxton can maintain his negligence and strict liability causes of action against defendants. We hold that he cannot.

■ Generally suppliers of raw materials to manufacturers cannot be liable for negligence or under a strict products liability theory to the manufacturers' employees who sustain personal injuries as a result of using the raw materials in the manufacturing process. Only in extraordinary circumstances—such as when the raw materials are contaminated, the supplier exercises substantial control of the manufacturing process, or the supplier provides inherently dangerous raw materials—can suppliers be held liable. No such circumstances exist here.

■ The only California cases we have found that impose liability on suppliers of raw materials under negligence and strict liability causes of action involve asbestos. As we shall explain, however, asbestos is inherently dangerous. We decline to extend the holdings of the asbestos cases here because the metal products involved are not inherently dangerous, and no other circumstances justify imposing liability on defendants for Maxton's injuries.

---

[1] Defendants Böhler-Uddeholm Corporation, TW Metals, Inc., Reliance Steel & Aluminum Co., Earle M. Jorgensen Company, Boeing Company, Metals Supply, Inc., Western States Metals, Inc., A.M. Castle & Co., Castle Metals Aerospace, Fry Steel Company, Rolled Alloys, Inc., Alcoa, Inc., Hi-Temp Metals, Inc., Joseph T. Ryerson & Son, Inc., Ryerson Inc., and Resco Products, Inc., are respondents on appeal and shall collectively be referred to as "defendants." There are other defendants named in the second amended complaint but they are not parties here.

## BACKGROUND

### 1. *Procedural History*

Defendants filed demurrers and motions for judgment on the pleadings challenging Maxton's second amended complaint, the operative pleading, on the grounds that they were not liable under the component parts doctrine. The trial court sustained the demurrers and granted the motions, and then entered judgments in favor of defendants.

### 2. *Allegations in the Second Amended Complaint*

The second amended complaint identifies with specificity the numerous metal products manufactured and supplied by each defendant. These products consisted of steel and aluminum ingots, sheets, rolls, tubes and the like.

The second amended complaint then alleges the following. From 1975 to 2007 Maxton worked as a laborer for LeFiell Manufacturing (LeFiell). Throughout his employment with LeFiell, Maxton "worked with and around" the metal products manufactured and supplied by defendants. Each of these products was used as intended by Maxton and his coworkers.

"The intended use of each of these metal products in cutting, grinding, sandblasting, welding, brazing, and other activities by Plaintiff and his co-workers in his vicinity resulted in the generation and release of toxicologically significant amounts of toxic airborne fumes and dusts composed of the various metallic toxins of which the metal products were composed." Maxton "was thereby exposed to and inhaled toxicologically significant amounts of toxic fumes and dusts . . . ." As a direct result of this exposure, Maxton "developed interstitial pulmonary fibrosis and other consequential injuries, which will require extensive medical treatment, hospitalizations, and organ transplantation as the disease progresses."

"Each of the foregoing metal products . . . were therefore themselves inherently hazardous products, because the foregoing intended melting, cutting, grinding, polishing, sanding, sandblasting, machining, and soldering of said metal products by Plaintiff and his co-workers in his vicinity resulted in the generation and release of toxicologically significant amounts of toxic airborne metallic fumes and dusts which are known causes of interstitial pulmonary fibrosis."

Defendants "fraudulently concealed the toxic hazards of their products" from Maxton. In particular, defendants concealed "that their products either were carcinogens and/or fibrogens, contained carcinogenic and/or fibrogenic

ingredients, or contained carcinogenic and/or fibrogenic contaminants as a result of manufacturing processes." They also failed to disclose to Maxton the "toxic" hazards of their products.

Defendants allegedly violated Labor Code sections 6390 and 6390.5 and the California hazard communication standard (Cal. Code Regs., tit. 8, § 5194), which require certain warnings regarding hazardous substances. In particular, each of the defendants did not provide a material safety data sheet (MSDS) or provided an inadequate MSDS.

Based on these allegations, the second amended complaint sets forth causes of action for (1) negligence, (2) strict liability—failure to warn, (3) strict liability—design defect, (4) fraudulent concealment, and (5) breach of implied warranties.

## DISCUSSION

Defendants mounted two kinds of challenges to the second amended complaint. Some defendants filed demurrers; others filed motions for judgment on the pleadings. The trial court sustained the demurrers and granted the motions on the same ground: the second amended complaint did not state facts sufficient to constitute a cause of action.[2] (Code Civ. Proc., §§ 430.10, subd. (e), 438, subd. (c)(1)(B)(ii).)

### 1. *Standard of Review*

On appeal from a judgment of dismissal following a ruling sustaining a general demurrer or granting a motion for judgment on the pleadings, we determine de novo whether the complaint alleges facts sufficient to constitute a cause of action. (*SC Manufactured Homes, Inc. v. Liebert* (2008) 162 Cal.App.4th 68, 82 [76 Cal.Rptr.3d 73] (*SC Manufactured Homes*); *Gami v. Mullikin Medical Center* (1993) 18 Cal.App.4th 870, 876 [22 Cal.Rptr.2d 819].) " 'We assume the truth of the properly pleaded factual allegations, facts that reasonably can be inferred from those expressly pleaded, and facts of which judicial notice can be taken. [Citation.] We construe the pleading in a reasonable manner and read the allegations in context. [Citation.]' " (*SC Manufactured Homes*, at p. 82.) However, we need not accept as true plaintiff's contentions, deductions or conclusions of fact or law. (*Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 6 [40 Cal.Rptr.3d 205, 129 P.3d 394].)

---

[2] In addition to demurring to the second amended complaint on the ground that it does not state facts sufficient to constitute a cause of action, some defendants demurred on the ground that the second amended complaint is uncertain. (Code Civ. Proc., § 430.10, subd. (f).) The trial court did not address this ground for demurrer and defendants do not raise the issue on appeal.

## 2. *The Component Parts Doctrine*

■ The component parts doctrine is set forth in section 5 of the Restatement Third of Torts, Products Liability (Restatement Third), which provides:

"One engaged in the business of selling or otherwise distributing product components who sells or distributes a component is subject to liability for harm to persons or property caused by a product into which the component is integrated if:

"(a) the component is defective in itself, as defined in this Chapter, and the defect causes the harm; or

"(b)(1) the seller or distributor of the component substantially participates in the integration of the component into the design of the product; and

"(2) the integration of the component causes the product to be defective, as defined in this Chapter; and

"(3) the defect in the product causes harm." (See *O'Neil v. Crane Co.* (2012) 53 Cal.4th 335, 355 [135 Cal.Rptr.3d 288, 266 P.3d 987] (*O'Neil*) ["The component parts doctrine provides that the manufacturer of a component part is not liable for injuries caused by the finished product into which the component has been incorporated unless the component itself was defective and caused harm."].)

■ A comment of the Restatement Third provides: "Product components include raw materials, bulk products, and other constituent products sold for integration into other products." (Rest.3d, § 5, com. a, p. 130.) We shall use the term "product components" in the same way here.

■ In *Artiglio v. General Electric Co.* (1998) 61 Cal.App.4th 830 [71 Cal.Rptr.2d 817] (*Artiglio*), after reviewing relevant legal authorities including a draft of the Restatement Third, the court described circumstances under which the supplier of a product component could not be held liable. The court stated: "[C]omponent and raw material suppliers are not liable to ultimate consumers when the goods or material they supply are not inherently dangerous, they sell goods or material in bulk to a sophisticated buyer, the material is substantially changed during the manufacturing process and the supplier has a limited role in developing and designing the end product.

When these factors exist, the social cost of imposing a duty to the ultimate consumers far exceeds any additional protection provided to consumers."[3] (*Id.* at p. 839.)

■ The component parts doctrine applies to both negligence (*Artiglio, supra,* 61 Cal.App.4th at p. 835) and strict liability (*Lee v. Electric Motor Division* (1985) 169 Cal.App.3d 375, 384–385 [215 Cal.Rptr. 195]) causes of action. With respect to negligence, if the doctrine is applicable, the defendant does not owe a duty of care. (*Artiglio,* at p. 834.) If the doctrine applies in strict liability cases, the defendant cannot be held liable. (*Wiler v. Firestone Tire & Rubber Co.* (1979) 95 Cal.App.3d 621, 629 [157 Cal.Rptr. 248].) Both duty and strict liability are matters of public policy. (*Tucker v. CBS Radio Stations, Inc.* (2011) 194 Cal.App.4th 1246, 1252 [124 Cal.Rptr.3d 245] [negligence]; *Arriaga v. CitiCapital Commercial Corp.* (2008) 167 Cal.App.4th 1527, 1535 [85 Cal.Rptr.3d 143] [strict liability].)[4]

The rationale for not imposing liability on a supplier of product components is a matter of equity and public policy. Such suppliers ordinarily do not participate in developing the product components into finished products for consumers. Imposing liability on suppliers of product components would force them to scrutinize the buyer-manufacturer's manufacturing process and end products in order to reduce their exposure to lawsuits. This would require many suppliers to retain experts in a huge variety of areas, especially if the product components are versatile raw materials. Courts generally do not impose this onerous burden on suppliers of product components because the buyer-manufacturers are in a better position to guarantee the safety of the manufacturing process and the end product. (Rest.3d, § 5, com. a, p. 131; *Springmeyer v. Ford Motor Co.* (1998) 60 Cal.App.4th 1541, 1554 [71 Cal.Rptr.2d 190]; *Taylor v. Elliott Turbomachinery Co. Inc.* (2009) 171 Cal.App.4th 564, 584 [90 Cal.Rptr.3d 414]; accord, *O'Neil, supra,* 53 Cal.4th at p. 363 [" 'It does not comport with principles of strict liability to impose on manufacturers the responsibility and costs of becoming experts in other manufacturers' products.' "]; *Zaza v. Marquess and Nell, Inc.* (1996) 144 N.J. 34 [675 A.2d 620, 634] (*Zaza*) ["Defendant would have to retain an expert to

---

[3] The "consumer" can be, as in this case, an employee of a manufacturer using the raw material or component part to make an end product.

[4] In this case, if the doctrine is applicable, it also bars Maxton's fourth cause of action for fraudulent concealment and fifth cause of action for breach of implied warranties. Maxton's fraudulent concealment cause of action is based on defendants' alleged "legal duty to fully disclose the toxic properties of their products directly to Plaintiff." If the doctrine applies, defendants had no such duty. Maxton's breach of implied warranties cause of action is based on the alleged "defective" nature of defendants' metal products. If the doctrine applies, the products are not defective as a matter of law.

determine whether each and every integrated manufacturing system that incorporates one of its sheet metal products is reasonably safe for its intended use."].)

A federal circuit court decision, cited by *Artiglio*, explained: "Making suppliers of inherently safe raw materials and component parts pay for the mistakes of the finished product manufacturer would not only be unfair, but it also would impose an intolerable burden on the business world . . . . Suppliers of versatile materials like chains, valves, sand, gravel, etc., cannot be expected to become experts in the infinite number of finished products that might conceivably incorporate their multi-use raw materials or components." (*In re TMJ Implants Products Liability Litigation* (8th Cir. 1996) 97 F.3d 1050, 1057.)

■ Suppliers of product components cannot escape liability when the raw materials or component parts are themselves defective. (Rest.3d, § 5, subd. (a); *Gonzalez v. Autoliv ASP, Inc.* (2007) 154 Cal.App.4th 780, 788 [64 Cal.Rptr.3d 908] (*Gonzalez*).) Raw materials can be defective if they are contaminated or otherwise contain a manufacturing defect.[5] (Rest.3d, § 5, com. c, p. 134.) Basic raw materials such as sand, gravel, or kerosene, however, cannot be defectively designed. (*Ibid.*) "Inappropriate decisions regarding the use of such materials are not attributable to the supplier of the raw materials but rather to the fabricator that puts them to improper use." (*Ibid.*) This is because the manufacturer is in a better position to select the materials used. (*Ibid.*; *Walker v. Stauffer Chemical Corp.* (1971) 19 Cal.App.3d 669, 674 [96 Cal.Rptr. 803] (*Walker*).)

"The same considerations apply to failure-to-warn claims against the sellers of raw materials. To impose a duty to warn would require the seller to develop expertise regarding a multitude of different end-products and to investigate the actual use of raw materials by manufacturers over whom the supplier has no control. Courts uniformly refuse to impose such an onerous duty to warn." (Rest.3d, § 5, com. c, p. 134; accord, *Artiglio, supra*, 61 Cal.App.4th at p. 839.)

The parties to this appeal cite numerous cases discussing the component parts doctrine. We shall discuss four of them, as well as an out-of-state case involving sheet metal, one of the products at issue here.

In *Walker*, the plaintiff was injured as the result of the explosion of a drain cleaning product which contained sulfuric acid supplied by the defendant.

---

[5] The second amended complaint does not allege that defendants' metal products were contaminated or otherwise contained a manufacturing defect.

(*Walker, supra,* 19 Cal.App.3d at p. 671.) The issue was whether the defendant could be held strictly liable for the plaintiff's injuries. At the time, the Restatement Third had not been promulgated. The applicable Restatement expressed no opinion regarding whether the seller of a component part or raw material that is substantially processed or changed could be strictly liable to the ultimate consumer. (19 Cal.App.3d at p. 673.)

The *Walker* court held: "We see no compelling reason for an extension [of strict liability] to a situation such as presented in the instant case." (*Walker, supra,* 19 Cal.App.3d at p. 674.) The court further stated: "We do not believe it realistically feasible or necessary to the protection of the public to require the manufacturer and supplier of a standard chemical ingredient such as bulk sulfuric acid, not having control over the subsequent compounding, packaging or marketing of an item eventually causing injury to the ultimate consumer, to bear the responsibility for that injury. The manufacturer (seller) of the product causing the injury is so situated as to afford the necessary protection." (*Ibid.*)

In *Jenkins v. T&N PLC* (1996) 45 Cal.App.4th 1224 [53 Cal.Rptr.2d 642] (*Jenkins*), the court held that the supplier of raw asbestos could be strictly liable for injuries caused by its product. The *Jenkins* court quoted an Illinois case, which stated: " ' "Although raw asbestos is processed before it is ultimately sold to consumers, raw asbestos and not some manufactured article caused the harm in this case. There was no change in the condition of the asbestos from the time it was sold until it reached the 'ultimate user,' [the employee of a purchaser of raw asbestos]. Moreover, the argument that but for the manufacturing process the asbestos would not have been altered begs the questions. [¶] *The evidence showed clearly that handling asbestos in any form produces dust. Liability may be imposed in a products case if the injury results from a condition of the product and the condition is unreasonably dangerous and existed when the product left the defendant's control.* . . . The proclivity of raw asbestos to give off dust was certainly a condition that existed when the product left defendant's control." ' " (*Id.* at p. 1229, quoting *Hammond v. North American Asbestos Corp.* (1983) 97 Ill.2d 195 [73 Ill.Dec. 350, 454 N.E.2d 210, 216].)

Following *Jenkins*, the court in *Arena v. Owens-Corning Fiberglas Corp.* (1998) 63 Cal.App.4th 1178 [74 Cal.Rptr.2d 580] (*Arena*) held that the supplier of raw asbestos was subject to strict liability. The *Arena* court distinguished its case from *Walker* on the grounds that the products involved in the two cases were materially different. Unlike sulfuric acid, which was substantially changed before it caused the plaintiff in *Walker* injuries, raw asbestos itself caused injury, and did not change when it became a component part of another product. (*Arena*, at p. 1188.)

The *Arena* court stated that the Restatement Third, which was in final draft form at the time, did not absolve the defendant from liability. (*Arena, supra,* 63 Cal.App.4th at p. 1191.) The court reasoned that "asbestos is not a component material that is usually innocuous, such as sand, gravel, nuts or screws. As correctly stated in *Jenkins,* it is the asbestos itself that produces the harmful dust." (*Ibid.*)

In *Artiglio,* the court held that the supplier of silicone material to breast implant manufacturers was not liable for injuries caused by the implants. In reaching its decision, the court quoted extensively from *Walker* and the final draft of the Restatement Third. (*Artiglio, supra,* 61 Cal.App.4th at pp. 837–839.) The *Artiglio* court acknowledged that the defendant developed silicone to meet the specifications of the manufacturers and consulted on a fairly regular basis about the problems the manufacturers were having.[6] (61 Cal.App.4th at p. 841.) Nonetheless, because the defendant did not exercise control over the design, testing or labeling of the implants, it was not liable for the injuries caused by them. (*Ibid.*)

In *Zaza,* the New Jersey Supreme Court held that the fabricator of sheet metal used in a system to produce decaffeinated coffee beans was not strictly liable to an employee of the coffee company who sustained injuries operating the system. The court stated: "It would serve no useful purpose to hold defendant strictly liable to plaintiff for the failure of [plaintiff's employer and the installer-assembler of the system] to install the safety devices or for [defendant's] failure . . . to adequately warn plaintiff. Holding defendant liable would result in an unreasonable expansion of the products liability law. 'In the developing steps towards higher consumer and user protection through higher trade morality and responsibility, the law should view trade relations realistically rather than mythically.' " (*Zaza, supra,* 675 A.2d at p. 636.)

### 3. *Under the Component Parts Doctrine, Defendants Are Not Liable*

#### a. *The* Artiglio *Factors Exist*

The metal products at issue here are clearly raw materials because they can be used in innumerable ways and they are not sold directly to consumers in the marketplace. Rather, they were sold to Maxton's employer for the purpose of using them to manufacture other products. Because the metal products consist of raw materials, we shall analyze the factors set forth in *Artiglio.*

---

[6] "[K]nowledge of how a raw material will be used does not, by itself, create a duty to investigate the risks posed by the final product." (*Artiglio, supra,* 61 Cal.App.4th at p. 838.)

Although the second amended complaint states the legal conclusion that the metal products are inherently hazardous, the facts alleged indicate otherwise. In particular, the second amended complaint does not state that Maxton was injured by simply handling the metal itself, or even the final product. Instead, the second amended complaint alleges that Maxton was injured as a result of the manufacturing process.

■ Maxton contends that the metal products involved here are analogous to asbestos, which is inherently dangerous. We disagree. Asbestos itself is dangerous when handled in any form even if it is unchanged by the manufacturer. Indeed, asbestos is dangerous when it leaves the supplier's control. By contrast, the metal products in this case were not dangerous when they left defendants' control. They only became dangerous because of the manufacturing process controlled by Maxton's employer, LeFiell. Accordingly, *Jenkins*, *Arena* and other cases involving raw asbestos are distinguishable from this case.

The second amended complaint also alleges facts which indicate that LeFiell was a sophisticated buyer. Over a period of more than three decades LeFiell purchased hundreds of different kinds of metal, abrasive and other industrial products with exact specifications from numerous suppliers. LeFiell's manufacturing process required its employees to operate sanding, grinding, sandblasting, cutting, welding, brazing, soldering and other machines in its facilities at Santa Fe Springs. Many of the metal parts LeFiell purchased were more than 20 feet long, and some were substantially larger. LeFiell was not a startup company operating out of the owner's home garage. It was a sophisticated industrial enterprise.

The second amended complaint further alleges facts indicating that the metal products were substantially changed during the manufacturing process. As stated *ante*, LeFiell's employees engaged in "melting, cutting, grinding, polishing, sanding, sandblasting, machining, and soldering" the products.

Finally, nothing in the second amended complaint indicates that defendants played any role whatsoever in developing or designing LeFiell's end products, nor does Maxton claim that they did so.

In sum, all four factors discussed in *Artiglio* exist here. We thus conclude that the social cost of imposing a duty on defendants and expanding the strict liability doctrine under the circumstances of this case far exceeds any additional protection provided to users of defendants' products, including Maxton. By social cost we mean the practical burdens that would be placed on defendants as suppliers of the ubiquitous metal products involved in this case. Defendants would be required to assess the risks of using their metal

products to manufacture other products. In order to make such assessments, defendants would need to retain experts on the countless ways their customers, including LeFiell, used their metal products. (*Artiglio, supra,* 61 Cal.App.4th at p. 839; *Zaza, supra,* 675 A.2d at p. 634.) Defendants would also be placed in the untenable position of second-guessing their customers whenever they received information regarding potential safety problems. (*Artiglio,* at p. 839.) We decline to expand the law of negligence and strict liability in that way.

### b. *The Metal Products Are Not Themselves Defective*

Maxton contends that the component parts doctrine does not apply because the metal products themselves are "defective." We reject this argument.

The present case is analogous to *Walker, Artiglio* and *Zaza,* which involved sulfuric acid, silicone, and sheet metal, respectively. These products, like the metal products involved here, are not defective in themselves.

The metal products in this case are closer to raw materials like kerosene (Rest.3d, § 5, com. c, p. 134) and nuts and screws (see *Arena, supra,* 63 Cal.App.4th at p. 1190) than they are to more-developed components of finished products, such as airbags in cars (*Gonzalez, supra,* 154 Cal.App.4th at p. 784) or windows in mass-produced houses (*Jimenez v. Superior Court* (2002) 29 Cal.4th 473, 479 [127 Cal.Rptr.2d 614, 58 P.3d 450]), because they can be used in innumerable ways. Raw materials generally cannot by themselves be defective unless they are contaminated. (Rest.3d, § 5, com. c, p. 134; *Artiglio, supra,* 61 Cal.App.4th at p. 838.) The one notable exception to this rule is raw asbestos, which as we explained, *ante,* is inherently dangerous. Because the metal products here are not analogous to raw asbestos or otherwise inherently dangerous, they are not themselves defective.

### c. *Defendants' Alleged Breach of Statutory and Regulatory Duties Is Not Grounds for a Negligence Cause of Action*

Maxton alleges that the steel, aluminum and other metal products supplied by defendants were "hazardous substances." He further alleges that defendants breached their duties under Labor Code sections 6390 and 6390.5 and the applicable regulations (Cal. Code Regs., tit. 8, § 5194) to provide certain warnings to Maxton, including an MSDS for each product. Defendants contend that their duty, if any, was to provide warnings and other information to LeFiell, and it was LeFiell's duty to pass that information on to Maxton.

We do not reach the issue of whether defendants breached Labor Code sections 6390 and 6390.5 and related regulations. As we shall explain,

assuming without deciding that defendants breached their statutory and regulatory obligations to provide certain warnings to Maxton regarding their metal products, Maxton cannot maintain a tort cause of action against defendants based on such a breach.

In *Johnson v. Honeywell Internat. Inc.* (2009) 179 Cal.App.4th 549 [101 Cal.Rptr.3d 726], the court addressed a similar issue. There, the plaintiff alleged that the defendants violated the same statutes and regulations at issue here. The court, however, found that the defendants were absolved from liability for negligence under the sophisticated user defense. With respect to the defendants' statutory and regulatory violations, the court stated: "[A]pplication of the sophisticated user defense here would not abrogate the statutes, absolve manufacturers of their statutory duties, or create exemptions to the MSDS requirements not placed into the law by the Legislature. Application of the defense will mean that some plaintiffs cannot recover in tort if the law is broken. It will not give anyone permission to break the law." (*Id.* at p. 557.)

The same is true in this case. Under the component parts doctrine, defendants did not have a duty of care to Maxton, and cannot be liable to him for negligence. Application of the doctrine does not absolve defendants of their obligations under Labor Code sections 6390 and 6390.5 or related regulations. It just means that Maxton cannot recover in tort for defendants' breach, if any, of those obligations.

### 4. *Maxton's Request for Leave to Amend*

When a general demurrer is sustained or a motion for judgment on the pleadings is granted, the plaintiff must be given leave to amend his or her complaint when there is a reasonable possibility that the defect can be cured by amendment. (*Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 43 [96 Cal.Rptr.2d 354] (*Rakestraw*); *Mendoza v. Continental Sales Co.* (2006) 140 Cal.App.4th 1395, 1402 [45 Cal.Rptr.3d 525].) "The burden of proving such reasonable possibility is squarely on the plaintiff." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

"To satisfy that burden on appeal, a plaintiff 'must show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading.' [Citation.] The assertion of an abstract right to amend does not satisfy this burden." (*Rakestraw, supra,* 81 Cal.App.4th at p. 43.) The plaintiff must clearly and specifically state "the legal basis for amendment, i.e., the elements of the cause of action," as well as the "factual allegations that sufficiently state all required elements of that cause of action." (*Ibid.*)

Here, Maxton requested in his reply brief leave to amend his second amended complaint in the event this court affirms the trial court's rulings with respect to defendants' demurrers and motions for judgment on the pleadings. Maxton, however, did not describe in his brief, specifically or otherwise, how he would amend his second amended complaint in order to cure its defects.

At oral argument Maxton stated that he could amend the second amended complaint by alleging defendants breached Labor Code sections 6390 and 6390.5 and related regulations by failing to provide required warnings to Maxton's employer, LeFiell.[7] For reasons we explained *ante*, however, this amendment would not cure the defects in Maxton's negligence cause of action. We therefore reject Maxton's request for leave to amend because he has not met his burden of showing there is a reasonable possibility that the deficiencies in the second amended complaint can be cured by amendment.

## DISPOSITION

The judgments are affirmed. Defendants are awarded costs on appeal.

Klein, P. J., and Croskey, J., concurred.

A petition for a rehearing was denied March 2, 2012, and appellant's petition for review by the Supreme Court was denied April 18, 2012, S200716. Kennard, J., Baxter, J., and Corrigan, J., did not participate therein.

---

[7] Currently the second amended complaint merely alleges that defendants breached their statutory and regulatory obligations by failing to provide warnings to *Maxton*.