Filed 3/21/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| FLAVIO RAMOS et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> BRENNTAG SPECIALTIES, INC., et al., <br><br> Defendants and Respondents. | B248038 <br> (Los Angeles County <br> Super. Ct. No. BC449958) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Amy D. Hogue, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Metzger Law Group, Raphael Metzger and Kenneth A. Holdren; Simon Greenstone Panatier Bartlett and Brian P. Barrow for Plaintiffs and Appellants.

Lynberg & Watkins, Ruth Segal and Rosemary Do for Defendant and Respondent Porter Warner Industries.

W. Eric Blumhardt, Tiffany J. Gates and Archer Norris; Kevin L. Place for Defendants and Respondents P-G Industries, Inc. and The Pryor-Giggey Company.

Snider, Diehl & Rasmussen, Stephen C. Snider and Trenton M. Diehl for Defendant and Respondent J.R. Simplot Company.

Gordon & Rees, Roger Mansukhani and Brandon D. Saxon for Defendant and Respondent Laguna Clay Company.

Schaffer, Lax, McNaughton & Chen, Jill A. Franklin and Yaron F. Dunkel for Defendant and Respondent Scott Sales Co.

Chuck Birkett Tsoong, Stephen S. Chuck, Tiffany M. Birkett and Victoria J. Tsoong for Defendant and Respondent Resource Building Materials.

Gordon & Rees, P. Gerhardt Zacher and Matthew P. Nugent for Defendants and Respondents Alcoa Inc. and Schorr Metals, Inc.

Bates Winter & Cameron, David L. Winter and Christopher R. Robyn for Defendant and Respondent Southwire Company.

K & L Gates and Michele Barnes for Defendant and Respondent Alcoa Inc.

McGuire Woods and Diane Flannery for Defendant and Respondent Century Kentucky, Inc.

Koletsky, Mancini, Feldman & Morrow and Susan L. Caldwell for Defendant and Respondent TST, Inc.

Hurrell Cantrall, Thomas C. Hurrell and Melinda Cantrall for Defendants and Respondents, United States Gypsum Co. and Westside Building Material Corp.

_____

In the underlying action, appellants Flavio Ramos and his wife asserted claims against respondents for negligence, negligence per se, strict liability, and loss of consortium, alleging that Ramos's exposure to their products during his

2

employment at a metal foundry caused his pulmonary fibrosis.[1]  Respondents demurrered to the claims on the ground that they failed under the component parts doctrine, as applied in *Maxton v. Western States Metals* (2012) 203 Cal.App.4th 81 (*Maxton*).  Relying on *Maxton*, the trial court sustained respondents' demurrer without leave to amend and thereafter entered a judgment of dismissal.

With the exception of appellants' claim for negligence per se, we conclude that the complaint states viable claims, and we respectfully disagree with the holding in *Maxton*.  As we explain, the component parts doctrine does not shield a product supplier from liability when a party alleges that he suffered direct injury from using the supplier's product as the supplier specifically intended.  We therefore affirm in part, reverse in part, and remand with directions to the trial court to enter a new order overruling respondents' demurrers to appellants' claims, with the exception of the claim for negligence per se.

**RELEVANT PROCEDURAL BACKGROUND**

On November 19, 2010, appellants initiated the underlying action.  Their second amended complaint (SAC) contained claims against respondents for negligence, negligence per se, strict liability based on a failure to warn and design defects, fraudulent concealment, breach of implied warranties, and loss of consortium.

The SAC alleged that from 1972 to 1978 and from 1981 to 2009, Ramos worked as a mold maker, machine operator, and laborer for Supreme Casting & Pattern, Inc. (Supreme), which manufactured metal parts through "a foundry and

---

[1]    Although both Flavio Ramos and his wife are appellants in this action, our references to Ramos refer to Flavio.

3

fabrication process."[2] While employed by Supreme, Ramos worked "with and around" metals, plaster and minerals that respondents supplied to Supreme. Respondents Alcoa Inc., Schorr Metals, Inc., Southwire Company, Century Kentucky, Inc. and TST, Inc. (metal suppliers) provided metal products, which were melted in furnaces to form metal castings. The casting process used molds created from plaster, sand, limestone and marble supplied by the remaining respondents, United States Gypsum Co., Westside Building Material Co., Porter Warner Industries, LLC., Resource Building Materials, P-G Industries, Inc., The Pryor-Giggey Company, J.R. Simplot Company, Laguna Clay Company, and Scott Sales Co. (mold material suppliers).[3] According to the SAC, Ramos developed interstitial pulmonary fibrosis as the result of his exposure to, inter alia, fumes from the molten metal and dust from the plaster, sand, limestone and marble.

Respondents sought judgment on the pleadings regarding the SAC, contending that appellants' claims failed under *Maxton*, which addressed similar claims under circumstances resembling those alleged in the SAC.[4] There, the plaintiff asserted claims for negligence, negligence per se, strict liability, fraudulent concealment, and breach of implied warranties against several defendants who had supplied metal products to his employer. (*Maxton*, *supra*, 203

---

[2]    The SAC also alleged that from 1979 to 1980, Ramos performed similar duties while employed by a different metal parts manufacturer.

[3]    The SAC alleges that those respondents provided the following materials: United States Gypsum Co. (plaster), Westside Building Material Co. (plaster), Porter Warner Industries, LLC. (plaster and zircon sand), P-G Industries, Inc. (plaster and zircon sand), The Pryor-Giggey Company (plaster and zircon sand), J.R. Simplot Company (silica sand), Laguna Clay Company, (limestone), Scott Sales Co. (limestone), Brenntag Specialties, Inc. (limestone), and Resource Building Materials (limestone and marble).

[4]    After Alcoa Inc. filed the motion for judgment on the pleadings based on *Maxton*, several of the other respondents joined in the motion.

4

Cal.App.4th at pp. 85-86.) The operative complaint alleged that the plaintiff, while employed as a laborer, "'worked with and around'" those metal products, which were cut, ground, sandblasted, welded, and brazed during his employer's manufacturing process. (*Id.* at p. 86.) The complaint further alleged that the suppliers failed to disclose the hazards of their products to the plaintiff, who developed interstitial pulmonary fibrosis due to his exposure to metallic fumes and dust from the products. (*Ibid.*)

The suppliers filed demurrers and a motion for judgment on the pleadings, asserting that the plaintiffs' claims failed under the so-called "component parts doctrine." (*Maxton*, *supra*, 203 Cal.App.4th at p. 88.) The trial court agreed, and ruled in the suppliers' favor without affording the plaintiff leave to amend his complaint. (*Id.* at p. 95.) In affirming the judgment of dismissal, the appellate court placed special emphasis on the discussion of the component parts doctrine in *Artiglio v. General Electric. Co.* (1998) 61 Cal.App.4th 830, 838-839 (*Artiglio*). The appellate court concluded that the doctrine, as set forth in *Artiglio*, shielded the suppliers from liability to the plaintiff arising from the use of their metal products in the manufacturing process. (*Maxton, supra,* at pp. 88-95 & fn. 3.)

In the instant action, the trial court granted judgment on the pleadings regarding the SAC with leave to amend, and advised appellants that to state causes of action, they must "plead around . . . *Artiglio*," as interpreted in *Maxton*. After appellants filed their third amended complaint, respondents asserted demurrers based on *Maxton,* which the court sustained with leave to amend. When appellants filed their fourth amended complaint (FAC), respondents again demurred on the basis of *Maxton*. The court sustained the demurrers without leave to amend, and entered a joint judgment of dismissal in favor of respondents. This appeal followed.

**DISCUSSION**

Appellants maintain the trial court erred in sustaining the demurrers to the FAC. Their principal contention is that the injuries alleged in the FAC fall outside the component parts doctrine. They assert that the doctrine, when applicable, relieves a supplier of component parts from liability for injuries arising from an end product into which the supplier's parts have been integrated. Because the FAC alleges that Ramos's injuries resulted from the direct and intended use of respondents' products, and not from injuries resulting from the use of any end product, appellants argue the component parts doctrine does not shield respondents from liability. We agree.[5]

A. *Standards of Review*

"Because a demurrer both tests the legal sufficiency of the complaint and involves the trial court's discretion, an appellate court employs two separate standards of review on appeal. [Citation.] . . . Appellate courts first review the complaint de novo to determine whether . . . the complaint alleges facts sufficient to state a cause of action under any legal theory, [citation], or in other words, to

---

[5] Appellants raise two other contentions: (1) that the component parts doctrine is an affirmative defense; and (2) that the FAC successfully "'plead[ed] around'" the specific elements of the defense, as stated in *Artiglio*. Generally, a demurrer predicated on an affirmative defense is properly sustained only when "the face of the complaint discloses that the action is necessarily barred by the defense." (*Casterson v. Superior Court* (2002) 101 Cal.App.4th 177, 183.) As explained below (see pt. C.4 & C.5., *post*), we conclude that under the facts alleged in the FAC, the component parts doctrine is inapplicable to the types of claims asserted in the FAC, and thus does not shield respondents from liability for Ramos's injuries. Accordingly, it is unnecessary to resolve whether the doctrine constitutes an affirmative defense. For similar reasons, it is unnecessary to determine whether the FAC adequately pleaded around the doctrine, as set forth in *Artiglio*.

6

determine whether . . . the trial court erroneously sustained the demurrer as a matter of law. [Citation.]" (*Cantu v. Resolution Trust Corp.* (1992) 4 Cal.App.4th 857, 879, fn. deleted (*Cantu*).) "Second, if a trial court sustains a demurrer without leave to amend, appellate courts determine whether . . . the plaintiff could amend the complaint to state a cause of action. [Citation.]" (*Id.* at p. 879, fn. 9.)

Under the first standard of review, "we examine the complaint's factual allegations to determine whether they state a cause of action on any available legal theory. [Citation.] We treat the demurrer as admitting all material facts which were properly pleaded. [Citation.] However, we will not assume the truth of contentions, deductions, or conclusions of fact or law [citation], and we may disregard any allegations that are contrary to the law or to a fact of which judicial notice may be taken. [Citation.]" (*Ellenberger v. Espinosa* (1994) 30 Cal.App.4th 943, 947.) In reviewing an order sustaining a demurrer, we will affirm the order on any ground raised in the demurrer, regardless of whether the trial court relied on it; moreover, we will consider new theories offered on appeal to support the ruling. (*B & P Development Corp. v. City of Saratoga* (1986) 185 Cal.App.3d 949, 959.)

Under the second standard of review, the burden falls upon the plaintiff to show what facts he or she could plead to cure the existing defects in the complaint. (*Cantu*, *supra*, 4 Cal.App.4th at p. 890.) "To meet this burden, a plaintiff must submit a proposed amended complaint or, on appeal, enumerate the facts and demonstrate how those facts establish a cause of action." (*Ibid*.)

Here, appellants neither offer nor suggest factual amendments to the FAC. Our inquiry is thus focused primarily on a question of law, namely, whether the facts as alleged in the FAC necessarily invoke the application of the component parts doctrine.

B.  *Governing Principles*

We begin by discussing the principles governing tort claims involving defective products, giving special attention to their application when a worker alleges injuries from products supplied to his or her employer for use by the employer's workers.

1.  *Liability For Product Defects*

Generally, a plaintiff may seek recovery in a "products liability" case either on a theory of strict liability or on a theory of negligence.  (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 478.)  Under either theory, the plaintiff must prove that a defect in the product caused injury.  (*Ibid.*)  In addition, to establish a negligence theory, a plaintiff must prove that the defect in the product was due to the defendant's negligence.  (*Ibid.*)  Generally, recovery is permitted for three kinds of defects:  manufacturing defects, design defects, and warning defects, that is, inadequate warnings or failures to warn.  (*Anderson v. Owens-Corning Fiberglas Corp.* (1991) 53 Cal.3d 987, 995; *Merrill v. Navegar, Inc.*, *supra*, 26 Cal.4th at p. 479; *Powell v. Standard Brands Paint Co.* (1985) 166 Cal.App.3d 357, 363-364.)

Here, the FAC contains strict liability claims for warning and design defects.  The "defective warning" claim alleges that respondents failed to warn Ramos of "scientifically known and knowable" hazards related to his use of their products.  "Generally speaking, manufacturers have a duty to warn consumers about the hazards inherent in their products.  [Citation.]  The requirement's purpose is to inform consumers about a product's hazards and faults of which they are unaware, so that they can refrain from using the product altogether or evade the danger by careful use."  (*Johnson v. American Standard, Inc.* (2008) 43

Cal.4th 56, 64.) A product that is otherwise flawless in its design and manufacture "'may nevertheless possess such risk to the user without a suitable warning that it becomes "defective" simply by the absence of a warning.'" (*Finn v. G. D. Searle & Co.* (1984) 35 Cal.3d 691, 699.)

The "design defect" claim relies on the so-called "consumer expectation[s]" test for defects. Under that test, a product is defective in design if it "fail[s] to perform as safely as an ordinary consumer would expect." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 562.) Because that test does not require the possibility of an alternative safer "design" for a product, raw asbestos has been determined to have a defective design under the test. (*Garza v. Asbestos Corp., Ltd.* (2008) 161 Cal.App.4th 651, 658-662; *Arena v. Owens Corning Fiberglas Corp.* (1998) 63 Cal.App.4th 1178, 1185-1186 (*Arena*).)[6]

The FAC also contains claims for negligence and negligence per se. In connection with the former, the FAC alleges primarily that respondents negligently failed to warn Ramos of the "scientifically known and knowable hazards" of their products. Generally, "a manufacturer or a supplier of a product is required to give warnings of any dangerous propensities in the product, or in its use, of which he knows, or should know, and which the user of the product would

---

[6] As explained in *Arena*, "[t]o the extent that the term 'design' merely means a preconceived plan, even raw asbestos has a design, in that the miner's subjective plan of blasting it out of the ground, pounding and separating the fibers, and marketing them for various uses, constitutes a design. . . . [W]hen that design violates minimum safety assumptions, it is defective. [Citation.] Whether or not the defendant is able to design the product in a different way is irrelevant . . . . [Citation.]" (*Arena, supra*, 63 Cal.App.4th at p. 1186, fn. deleted.)

9

not ordinarily discover." (*Groll v. Shell Oil Co.* (1983) 148 Cal.App.3d 444, 448 (*Groll*).)[7]

Regarding the claim for negligence per se, we observe that ordinarily, "'[t]he doctrine of negligence per se is not a separate cause of action, but creates an evidentiary presumption that affects the standard of care in a cause of action for negligence.' [Citation.] [¶] The doctrine of negligence per se does not provide a private right of action for violation of a statute. [Citation.]" (*Johnson v. Honeywell Internat., Inc.* (2009) 179 Cal.App.4th 549, 555, quoting *Millard v. Biosources, Inc.* (2007) 156 Cal.App.4th 1338, 1353, fn. 2.) Under the doctrine, "the plaintiff 'borrows' statutes to prove duty of care and standard of care." (*Johnson v. Honeywel Internat., Inc., supra,* at p. 558.)[8] Nonetheless, the term "'negligence per se'" has occasionally been applied when a statute establishes a special duty of care beyond that underlying common law negligence. (*Connell v.*

---

[7] Section 388 of the Restatement Second of Torts states: "One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier [¶] (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and [¶] (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and [¶] (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous."

[8] Evidence Code section 669 provides that a presumption of negligence is established when a defendant "(1) . . . violated a statute, ordinance, or regulation of a public entity; [¶] (2) [t]he violation proximately caused death or injury to person or property; [¶] (3) [t]he death or injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and [¶] (4) [t]he person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted." (Evid. Code, subd. (a)(1)(2)(3).)

10

*Harris* (1913) 23 Cal.App. 537, 541; see 4 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 583, p. 710 [discussing cases].)

In connection with the negligence per se claim, the FAC alleges that respondents violated Labor Code section 6390.5, which requires manufacturers and distributors to provide labels on their products in compliance with attendant regulations (see Cal. Code Regs., tit. 8, § 5194). (*Johnson v. Honeywell Internat., Inc.*, *supra*, 179 Cal.App.4th at p. 556.) Those regulations oblige manufacturers and distributors to specify hazards related to the products on the labels or in material safety data sheets provided to employers; in addition, the regulations require employers to educate their employees regarding those hazards. (*Ibid.*)

### 2. *Doctrines Limiting Liability*

Under three distinct but potentially overlapping doctrines, courts have limited a supplier's liability for injury arising from certain uses or applications of its product. Two of these doctrines -- often called the "bulk supplier" and "sophisticated buyer" rules -- focus on whether the product, before causing injury, passed to, or through, a party who knew (or should have known) of the product's hazards. (*Artiglio, supra,* 61 Cal.App.4th at pp. 838-839; see *Taylor v. Am. Chemistry Council* (1st Cir. 2009) 576 F.3d 16, 24-25.) The first doctrine is ordinarily invoked when a supplier, upon selling a product in bulk to an intermediary who passes it on, warns the intermediary of the product's hazards. (*Taylor v. Am. Chemistry Council, supra,* 576 F.3d at pp. 25-26.) In contrast, the second doctrine is ordinarily invoked when the supplier provides the product to a purchaser -- either an intermediary or an end user -- who knows (or should know) of the hazards, regardless of any warning to the purchaser. (See *ibid.*) Although conceptually distinct, the two rules are sometimes combined under the term,

"'bulk sales/sophisticated purchaser doctrine[].'" (See *Artiglio*, *supra*, 61 Cal.App.4th at pp. 838-839.)

The third doctrine is known as the "component part[s]" or, where applicable, "raw materials" doctrine. (*Artiglio*, *supra*, 61 Cal.App.4th at p. 839; *Springmeyer v. Ford Motor Co.* (1998) 60 Cal.App.4th 1541, 1550-1554.) Under that doctrine, suppliers of component parts or raw materials integrated into an "end product" are ordinarily not liable for defects in the end product, provided that their own parts or materials were nondefective, and they did not exercise control over the end product. (*Artiglio*, *supra*, at pp. 839-840; *Bay Summit Community Assn. v. Shell Oil Co.* (1996) 51 Cal.App.4th 762, 772.) The doctrine is reflected in section 5 of the Restatement Third of Torts, Products Liability, which states that a component part supplier is subject to liability for harm caused by the end product only when the component itself has a defect that results in injury, or the supplier plays a material role in integrating the component into the end product whose defects cause injury. (Rest.3d Torts, Products Liability, § 5.)[9]

The application of the component parts doctrine was examined in *Artiglio*. There, the plaintiffs asserted negligence claims against a silicone supplier, alleging that they had been injured by silicone breast implants made by a manufacturer who had obtained silicone from the supplier. (*Artiglio, supra,* 61 Cal.App.4th at pp. 833-834.) The plaintiffs contended the supplier knew or should have known

_____

[9]     Section 5 of the Restatement Third of Torts, Products Liability, states in pertinent part:  "One engaged in the business of selling or otherwise distributing product components who sells or distributes a component is subject to liability for harm to persons or property caused by a product into which the component is integrated if:  [¶] (a) the component is defective in itself, . . . and the defect causes the harm; or [¶] (b)(1) the seller or distributor of the component substantially participates in the integration of the component into the design of the product; and [¶]  (2) the integration of the component causes the product to be defective . . . and (3) the defect in the product causes the harm."

that its silicone materials were not appropriate for use in medical devices, yet it failed to warn the manufacturer. (*Id*. at p. 835.)

The appellate court affirmed the trial court's grant of summary judgment to the supplier. (*Artiglio*, *supra*, 61 Cal.App.4th at p. 841.) Following a survey of authorities regarding the "'bulk sales/sophisticated purchaser'" and component parts doctrines, the appellate court stated: "[C]omponent and raw material suppliers are not liable to ultimate consumers when the goods or material they supply are not inherently dangerous, they sell goods or material in bulk to a sophisticated buyer, the material is substantially changed during the manufacturing process and the supplier has a limited role in developing and designing the end product. When these factors exist, the social cost of imposing a duty to the ultimate consumers far exceeds any additional protection provided to consumers." (*Id*. at p. 839.)

Applying those factors to the evidence before it, the appellate court concluded that summary judgment was proper. (*Artiglio*, *supra*, 61 Cal.App.4th at pp. 840-841.) In so concluding, the court observed that the silicone materials were not inherently dangerous, as they became potentially unsafe only when used in medical devices; that the implant manufacturers were "highly sophisticated buyers"; that the silicone materials were substantially transformed during the manufacturing process; and that the supplier had no role in designing the implants. (*Id*. at pp. 840-841.)

### 3. *Injuries From Product's Use By Worker*

We turn to decisions predating *Maxton* that addressed product liability claims by workers alleging that they suffered injury from products used in their work. Applications of the principles we have discussed are found in *Wright v.*

13

*Stang Manufacturing Co.* (1997) 54 Cal.App.4th 1218, 1222 (*Wright*), *Tellez-Cordova v. Campbell-Hausfeld/Scott Fetzger Co.* (2004) 129 Cal.App.4th 577 (*Tellez-Cordova*); *Schwoerer v. Union Oil Co.* (1993) 14 Cal.App.4th 103 (*Schwoerer*), and a decision of the Minnesota Supreme Court, *Gray v. Badger Mining Corp.* (Minn. 2004) 676 N.W.2d 268 (*Gray*).

In *Wright*, the defendant manufactured a water cannon that had been mounted on a fire engine owned and operated by a public fire department. (*Wright, supra*, 54 Cal.App.4th at p. 1222.) When the plaintiff, a public firefighter, used the water cannon, it broke loose from its mount, threw him to the ground and fell on him, causing injury. (*Ibid*.) The defendant obtained summary judgment on the plaintiff's products liability claims on the theory that the cannon's mount, rather than the cannon itself, was defective. (*Id*. at pp. 1222-1223.) The appellate court reversed, concluding there were triable issues whether the cannon suffered from a design defect because it was incompatible with a sufficiently strong mounting system; in addition, the court determined there were triable issues whether the defendant had failed to warn about a potential mismatch between the cannon's water pressure and the strength of its mount. (*Id*. at pp. 1230-1236.) In so concluding, the court rejected the defendant's contention that it was exempt from liability as a "component part manufacturer[]," reasoning, inter alia, that the specific hazards arising from the cannon's installation for its intended use were sufficiently obvious to the defendant to trigger a duty to warn. (*Id*. at pp. 1234, 1235-1236.)

In *Tellez-Cordova*, the plaintiff asserted strict liability claims based on warning and design defects against manufacturers of grinding tools the plaintiff had used. The plaintiff's complaint alleged that he had suffered injury as the result of exposure to toxic dust released from abrasive discs powered by the tools.

14

(*Tellez-Cordova, supra*, 129 Cal.App.4th at pp. 579-580.) The defendants successfully demurred to the complaint on the basis of the component parts doctrine. (*Id*. at p. 581.) In reversing, the appellate court noted that the complaint alleged that the tools were specifically designed to be used with the abrasive discs for the purpose of grinding metals, and that toxic dust was created when the tools were used for the purpose intended by their manufacturers. (*Id*. at pp. 582-583.)

In *Schwoerer*, the plaintiff worked as a mechanic on a boring machine cutting an underground tunnel. (*Schwoerer, supra*, 14 Cal.App.4th at p. 109.) While in the tunnel, he used a solvent his employer had purchased and provided. (*Ibid*.) Through intermediary suppliers, the employer received the manufacturer's material safety data sheet warning that exposure to the solvent could cause skin and respiratory irritation, but the employer did not pass those warnings along to the plaintiff. (*Id*. at p. 109.) Because the plaintiff's job responsibilities required him to dip machine parts into the solvent, he frequently worked "up to his elbows" in it, yet his employer provided no protective clothing. (*Id*. at p. 109.) After the plaintiff suffered permanent liver damage, he asserted products liability claims against the manufacturer and intermediary suppliers, who secured summary judgment in their favor on the theory that their warnings to the employer that the solvent could cause skin and respiratory irritation insulated them from liability for the plaintiff's injuries. (*Id*. at p. 106.)

The appellate court reversed, concluding that the warnings were insufficient to apprise the plaintiff of the injuries he actually suffered. (*Schwoerer*, *supra*, 14 Cal.App.4th at pp. 112-114.) Focusing on whether the warnings given provided sufficient notice of the solvent's potential for causing liver damage, the court determined they did not: "[P]laintiff claims his liver was irreparably damaged, an injury different in kind from and significantly greater than any consequence of

15

dermal exposure against which the [material safety data sheet] warned." (*Id*. at pp. 110-114.)**10**

Particularly instructive is *Gray*. There, a foundry worker asserted product liability claims based on a failure to warn against a silica sand supplier, alleging that he contracted silicosis due to exposure to the supplier's sand, which he had used in making casting molds in the foundry. (*Gray, supra,* 676 N.W.2d. at pp. 271-272.) After an appellate court determined that the worker's claims failed because the foundry was a sophisticated purchaser of sand, the Minnesota Supreme Court reversed, concluding that there were triable issues regarding the application of "bulk sales" and "sophisticated purchaser" doctrines. (See *id*. at pp. 275-280.) Regarding these doctrines, the court noted that the supplier had provided only inadequate warnings regarding the hazards of its sand to the foundry, and that there was no evidence the supplier had reason to believe the foundry would provide adequate warnings to its workers. (*Ibid.*)

The court also rejected application of the component parts doctrine, stating: "Although sand is a raw material and is not inherently dangerous, it is nevertheless dangerous when used in a foundry process. [The supplier] specifically develops sand for foundry use and has conceded that it understands the manner in which silica is used in the foundry process. More importantly, the sand is not used as a component of a finished product, and it is the sand -- not the finished product -- that is dangerous to foundry workers." (*Gray*, *supra*, 676 N.W.2d at p. 281.)

---

**10** Although the plaintiff in *Schwoerer* asserted only a "warning defect" strict liability claim against the manufacturer, the appellate court determined that its conclusion was also applicable to a "warning defect" negligence claim. (*Schwoerer, supra,* 14 Cal.App.4th at p. 106, fn. 2.)

C. *Analysis*

We next examine whether respondents' demurrers to the FAC were properly sustained. As explained below, with the exception of the claim for negligence per se, we conclude the FAC states tenable claims (see pts C.1, C.2 & C.3. *post*).

1. *Strict Liability and Negligence Claims*

The FAC adequately pleads strict liability and negligence claims predicated on warning and design defects.[11] Regarding the warning defect claims, the FAC alleges that respondents' products were specialized materials used as respondents specifically intended in Supreme's manufacturing process.[12] The FAC further alleges that respondents' metal products were "inherently dangerous" in themselves when melted during the casting process, as they released metallic toxins known to cause interstitial pulmonary fibrosis. The FAC also alleges that respondents' plaster, sand, limestone and marble were "inherently dangerous," as they released silica dust and other known causes of interstitial pulmonary fibrosis

---

[11] As explained in *Bockrath v. Aldrich Chemical Co.* (1999) 21 Cal.4th 71, 78-84, when a worker asserts that he suffered personal injuries due to exposure to toxins contained in products with which he worked, the complaint must allege facts establishing the supplier's breach of duties regarding those products and the causation of the worker's injuries.

[12] The FAC alleges that the metal suppliers' products were "specialized metal alloys manufactured and sold . . . for specialized applications," and were "melted as specifically designed and intended by [the metal suppliers] in furnaces during foundry operations . . . ." The FAC contains similar allegations regarding the products from the mold material suppliers, namely, the plaster, sand, limestone and marble used to create the casting molds. According to the FAC, the plaster was "specifically designed and intended" by the plaster suppliers "for the purpose of making plaster molds of the type used in casting operations," and the other materials were "sold and supplied by [their suppliers] for the specialized purpose of being used to create molds for the casting of metals."

17

when Ramos scooped them out of bags, poured them into containers, and handled them in other ways.

According to the FAC, although state and federal regulations identified the products or their constituents as hazardous, respondents provided no warnings to Ramos.[13]  In addition, respondents failed to comply with their statutory duty to provide appropriate material safety data sheets to his employer, Supreme.  The FAC further asserts that Supreme was not a sophisticated purchaser, as it was "a small unsophisticated company with a relatively small number of employees," none of whom were aware of the hazards of working with respondents' products.

In our view, the allegations are sufficient to state "defective warning" claims.  The allegations establish a duty to warn, as they assert (1) that respondents knew, or should have known, of hazards arising from their products when used as intended in the metal casting process, and (2) that users such as Ramos were unlikely to discover those hazards on their own.  Because the FAC otherwise alleges that Ramos suffered injury from exposure to those hazards, the "defective warning" claims are adequately pleaded.

We reach the same conclusion regarding the strict liability claim predicated on a defective design.  That claim invokes the "consumer expectations" test for defects, alleging that respondents' products "failed to perform as safely as an ordinary user would expect when used in an intended or reasonably foreseeable

---

[13]     The FAC alleges that federal and state regulations describe metal ingots intended for melting as dangerous materials, and identify certain metals contained in the metal suppliers' products as hazardous (including aluminum, chromium, copper, iron, manganese, molybdenum, and titanium).  The FAC further asserts that those metals can cause interstitial pulmonary fibrosis.  The FAC also contains materially similar allegations regarding constituents of the plaster, sand, limestone and marble.

manner . . . ." Because the test does not require plaintiffs to identify an alternative safer "design" for the products, we see no fatal defect in the claim.

### 2. *Negligence Per Se Claim*

In contrast, the FAC states no independent claim for negligence per se. As noted above (see pt. B.1., *ante*), that claim is predicated on allegations that respondents violated Labor Code section 6390.5 and its attendant regulations. However, that statute affords workers no private right of action for such violations against a supplier of injurious products to their employer. (See *Johnson v. Honeywell Internat. Inc.*, *supra*, 179 Cal.App.4th at p. 556.) Accordingly, although appellants may rely on evidence of those violations to prove their negligence claim (*Elsner v. Uveges* (2004) 34 Cal.4th 915, 935-936), the demurrers to the negligence per se claim were properly sustained. (*Das v. Bank of America, N.A.* (2010) 186 Cal.App.4th 727, 737-740.)

### 3. *Other Claims*

We further conclude that the FAC's remaining claims for fraudulent concealment, breach of implied warranties, and loss of consortium are adequately pleaded. Generally, to state a fraudulent concealment claim against a product supplier, an employee may allege that the supplier, in providing the product to the employer, intentionally withheld information regarding the product's injurious hazards. (*Jones v. ConocoPhillips* (2011) 198 Cal.App.4th 1187, 1198-1201.) The FAC alleges those facts, which are also sufficient to establish a claim for breach of implied warranties. (*Id.* at pp. 1201-1202.) Finally, because the FAC adequately pleads Ramos's personal injury claims and alleges that appellants are

married, the FAC is sufficient to support his wife's claim for loss of consortium. (*Vanhooser v. Superior Court* (2012) 206 Cal.App.4th 921, 927-928.)[14]

### 4. *Maxton*

In sustaining respondents' demurrers without leave to amend, the trial court understandably concluded that the claims in the FAC failed under *Maxton*. However, to the extent *Maxton* can be read to conclude that the component parts doctrine, as set forth in *Artiglio,* is ordinarily applicable to the type of claim asserted in the FAC, we disagree with its rationale. For the reasons explained below, neither the component parts doctrine nor its underlying rationale supports such application to the facts alleged here.

The California Supreme Court, numerous appellate courts, and the Restatement Third of Torts have recognized that the component parts doctrine applies to harm caused by "finished product[s]" into which the supplier's product has been incorporated. (*O'Neil v. Crane Co.* (2012) 53 Cal.4th 335, 355; *Taylor v. Elliot Turbomachinery Co., Inc* (2009) 171 Cal.App.4th 564, 584 (*Taylor*) [discussing cases].) Section 5 of the Restatement Third of Torts, Products Liability, addresses liability for harm "caused by a product into which the component is integrated . . . ." As noted in *Gray*, on its face, the component parts doctrine does not target claims by a party alleging that he suffered a direct injury

---

[14] On appeal, Resource Building Materials contends that appellants' claims against it fail because the FAC contains no allegation that Ramos was exposed to any limestone or sand products that it supplied. We disagree. The FAC provides a list, "by named defendant," of sand and limestone products, . . . to which . . . Ramos[] was exposed, or which caused [him] to be exposed to toxic metallic and inorganic fumes, vapors, and dusts during the course of [his] employment, and which caused [his] toxic injuries and occupational diseases." Resource Building Materials is among those named defendants.

from using a product as the supplier specifically intended. (*Gray*, *supra*, 676 N.W.2d at p. 281.)

In contrast, *Artiglio* addressed claims against a supplier of a material for injuries caused by the finished product into which the material was integrated. (*Artiglio, supra,* 61 Cal.App.4th at pp. 833-834.) *Artiglio*'s statement of the component parts doctrine underscores its circumscribed application: "[C]omponent and raw material suppliers are not liable to *ultimate* consumers when the goods or material they supply are not inherently dangerous, they sell goods or material in bulk to a sophisticated buyer, the material is substantially changed during the manufacturing process and the supplier has a limited role in developing and designing *the end product*." (*Id.* at p. 839, italics added.) Although the doctrine may be invoked when a worker suffers injury while engaged in employment that incorporates or uses a supplier's component part, its application has ordinarily been restricted to situations in which the injuries were attributable to an item over which the supplier lacked material control, such as the employer's manufacturing system itself (viewed as the "finished product"), or to some other element of the system, rather than to the supplier's component part. (See *Taylor*, *supra*, 171 Cal.App.4th at pp. 584-586.) Here, in contrast, the FAC alleges a direct injury from the intended use of respondents' products -- not from any finished product, manufacturing system into which the products were integrated, or apparatus built to the employer's specifications.[15]

_____

[15] Respondents contend that a "myriad" of cases have applied the component parts doctrine to claims resembling those in the FAC. We conclude that none of those cases supports application of the doctrine to the claims asserted in the FAC.

In several of the cases, the pertinent injuries arose from a finished product sold to the public that contained the defendant's product as a component, or from another component of the finished product not provided by the defendant. In each case, the
*(Fn. continued on next page.)*

appellate court concluded that the defendant was not liable for the injuries because it lacked material control over the finished product. (*Lee v. Electric Motor Division* (1985) 169 Cal.App.3d 375, 381-387 [supplier of "ordinary, off-the-shelf" electric motors not liable for injuries from meat grinding machine lacking emergency brake because supplier had no role in machine's design and manufacture]; *Wiler v. Firestone Tire & Rubber Co.* (1979) 95 Cal.App.3d 621, 627-629 [supplier of tires lacking valves not liable for injuries arising from defective valve, as intermediate manufacturer attached valve to tire before providing it to injured party]; *Walker v. Stauffer Chemical Corp.* (1971) 19 Cal.App.3d 669, 672 [supplier of acid not liable for injuries from drain cleanser containing acid as component, as acid was substantially changed during the process of making the cleanser, over which supplier had no control].)

Similarly, in all but one of the cases, a worker alleged injuries from the employer's manufacturing system that incorporated the defendant's product, or from an item used in combination with that product, and the appellate court determined that the defendant lacked material control regarding the particular hazard that caused the injuries. (*Taylor, supra,* 171 Cal.App.4th at pp. 577-586 [worker's injuries arose from asbestos-laden gaskets and packing, rather than from defendant's valves used with the gaskets and packing]; *Gray v. R.L. Best Co.* (N.Y. App. Div. 2010) 910 N.Y.S.2d 307, 309 [78 A.D.3d 1346] [worker injured by accidental operation of employer's aluminum extrusion press while replacing part supplied by defendant]; *Ranger Conveying & Supply Co. v. Davis* (Tex.App. 2007) 254 S.W.3d 471, 475-485 [worker injured when bale fell from employer's truck onto conveyor belt owned by employer and provided by defendant]; *Brocken v. Entergy Gulf States, Inc.* (Tex.App. 2006) 197 S.W.3d 429, 435-438 [worker received shock from employer's electrical system that incorporated defendant's circuit breaker, which was rendered ineffective by employer's error in designing system]; *Toshiba Intern. Corp. v. Henry* (Tex.App. 2004) 152 S.W.3d 774, 777-786 [worker injured by accidental operation of aluminum "scrap winder" into which defendant's part had been incorporated]; *Temple v. Wean United, Inc.* (1977) 50 Ohio St.2d 317, 323-329 [364 N.E.2d 267, 270-274] [plaintiff injured by accidental operation of punch press into which defendant's "on-off" buttons had been incorporated].)

In the remaining case, a worker alleged that he suffered injuries from hot materials from a "quench tank" supplied by the defendant after the tank had been integrated into the employer's manufacturing system. (*Zaza v. Marquess and Nell, Inc.* (1996) 144 N.J. 34, 42 [675 A.2d 620, 624].) The appellate court concluded that the component parts doctrine shielded the defendant from liability, reasoning that the defendant built the tank according to the employer's specifications, and that the tank was defective only because the employer integrated it into the manufacturing system without suitable safety mechanisms. (144 N.J. at pp. 47-65 [675 A.2d at pp. 626-636].) Here, in contrast, the
*(Fn. continued on next page.)*

22

Apart from falling outside the letter of the component parts doctrine, the injuries alleged in the FAC also fall outside the doctrine's rationale. The Restatement Third of Torts, Products Liability, explains that rationale in the following terms: "As a general rule, component sellers should not be liable when the component itself is not defective . . . . If the component is not itself defective, it would be unjust and inefficient to impose liability solely on the ground that the manufacturer of the integrated product utilizes the component in a manner that renders *the integrated product defective*. Imposing liability would require the component seller to scrutinize another's product which the component seller has no role in developing. This would require the component seller to develop sufficient sophistication to review the decisions of the business entity that is already charged with responsibility for the integrated product." (Rest.3d Torts, Products Liability, § 5, com. a, p. 131, italics added.) Here, the FAC alleges that Ramos suffered injuries not from a defective "integrated product" that incorporated respondents' products, but from those products themselves, which he used as respondents intended in the course of Supreme's manufacturing process.

Furthermore, application of the component parts doctrine, as set forth in *Artiglio*, is ill-suited to the assessment of the FAC's claims. To begin, an inquiry into whether the supplier's product was "inherently dangerous" -- the first factor specified in *Artiglio* -- presupposes that the product was potentially a component of multiple end products, and focuses on whether the supplier's product was foreseeably dangerous in all those uses. Thus, in *Artiglio*, the appellate court determined that the manufacturer's silicone was not inherently dangerous because it had been safely incorporated into many nonmedical devices, and became

---

FAC alleges that respondents did not design their products in accordance with Supreme's
*(Fn. continued on next page.)*

23

potentially dangerous only when used in breast implants. (*Artiglio, supra*, 61 Cal.App.4th at p. 840.) That type of inquiry, however, is inappropriate when a worker alleges that he suffered injury by using a product as intended by its supplier. As explained above (see pt. B.1 & B.3, *ante*), in suitable circumstances, a supplier must warn workers of hazards they will encounter when the supplier's product is put to the use intended or specified by the supplier.[16]

The second *Artiglio* factor, namely, whether the supplier sold in bulk to a sophisticated purchaser, focuses attention on whether the purchaser knew, or should have known, that the supplier's products were hazardous when put to the purchaser's use. (*Artiglio*, *supra*, 61 Cal.App.4th at p. 830.) In *Maxton,* the appellate court found that some of the plaintiff's claims failed solely because his employer, who had bought many types of metal over a lengthy period, was necessarily a sophisticated purchaser. (*Maxton, supra,* 203 Cal.App.4th at pp. 93, 94-95.) Relying on *Maxton*, respondents argue that because the FAC alleges that Supreme had operated a foundry for a lengthy period, it must be regarded, as a matter of law, as a sophisticated purchaser.

We are doubtful that the allegation of lengthy use, standing alone, is sufficient to establish Supreme's status as a sophisticated purchaser as a matter of law. Even if it were, however, this factor omits a consideration crucial to the application of the sophisticated purchaser doctrine to the facts alleged here. As this court recently explained, when a worker asserts defective warning claims

specifications, and that Supreme was unaware of the products' hazards.

[16] We granted a request from the Council for Education and Research on Toxics and several other parties to submit a brief as amici curiae addressing the proper application of the first *Artiglio* factor. Because we conclude that the component parts doctrine is inapplicable to the claims alleged in the FAC, it is unnecessary to examine their contentions.

against a product supplier, the employer's status as a sophisticated purchaser does *not* shield the supplier from liability as a matter of law; the supplier must also show that it had some reason to believe the worker knew, or should have known, of the product's hazards. (*Pfeifer v. John Crane, Inc.* (2013 ) 220 Cal.App.4th 1270, 1298-1299 (*Pfeifer*).) That showing may be made in numerous ways, including the presentation of evidence that the specific dangers were so readily apparent to the employer that it would be expected to protect its workers. (*Ibid*.) No such facts are alleged in the FAC.[17]

The third *Artiglio* factor, namely, whether the supplier's product "is substantially changed during the manufacturing process," is reasonably viewed as limiting a supplier's liability only for injuries arising from an end product into

---

[17] Pointing to *Johnson v. American Standard, Inc.*, *supra*, 43 Cal.4th 56, respondents suggest that an employer's status as a sophisticated purchaser, by itself, shields a supplier from liability. As we explained in *Pfeifer, Johnson* supports the contrary position. (*Pfeifer*, *supra*, 220 Cal.App.4th at pp. 1296-1297.)

In a related contention, respondents observe that several out-of-state courts, applying the sophisticated purchaser doctrine, have found suppliers of sand and similar materials to employers not liable for injuries to employees engaged in making end products. However, in each case, evidence in the record established that the employer had full knowledge of the hazards, or that the hazards were apparent to the employer. (*Bates v. E.D. Bullard Co.* (La.Ct.App. 2011) 76 So.3d 111, 113, 114 [evidence showed that hazards from silica sand to workers engaged in sandblasting were "'common knowledge'"]; *Bergfeld v. Unimin Corp.* (8th Cir. 2003) 319 F.3d 350, 354 [foundry knew that excessive exposure to silica dust was hazardous]; *Cowart v. Avondale Industries, Inc.* (La.Ct.App. 2001) 792 So.2d 73, 76-77 [sand supplier provided adequate warnings of hazards to foundry]; *Phillips v. A.P. Green Refractories Company* (Pa.Super.Ct. 1993) 630 A.2d 874, 883 [foundry had full knowledge of dangers of silica dust]; *Smith v. Walter C. Best, Inc.* (W.D. Pa. 1990) 756 F.Supp. 878, 886-889 [same]; *Ryntz v. Afrimet Indussa, Inc.* (6th Cir. 1989) 887 F.2d 1087 [employer had full knowledge of dangers of cobalt dust]; *Beale v. Hardy* (4th Cir. 1985) 769 F.2d 213, 214-215 [foundry had extensive knowledge of dangers from silica dust and appropriate safety measures].) Not only does the FAC contain no admission of such knowledge, it asserts that Ramos's employer was unaware of the hazards of respondents' products.

25

which the supplier's product has been integrated. In contrast, when a supplier's product itself has a specific intended use, the supplier ordinarily must provide warnings regarding hazards likely to be encountered in that use, even when the intended use involves the product's transformation or destruction (*Groll*, *supra*, 148 Cal.App.3d at pp. 446-448 [manufacturer's data sheet adequately warned that lantern and stove fuel should be kept away from source of sparks]; *Proctor & Gamble Co. v. Superior Court* (1954) 124 Cal.App.2d 157, 159, 162 [warning required that use of detergent could caused dermatitis]), or its deployment at some stage of a construction or manufacturing process (*Crane v. Sears, Roebuck & Co.* (1963) 218 Cal.App.2d 855, 857-859 [warning required that fluid for preparing surfaces for painting was combustible]).

The fourth *Artiglio* factor -- whether the supplier has control over the end product -- is also ordinarily pertinent only to injuries arising from an end product into which the supplier's product has been incorporated. When, as in the FAC, a worker alleges that he suffered injuries directly from the supplier's product, but not from his employer's end product, the supplier's lack of control over the design and development of the end product is irrelevant to the rationale underlying the component parts doctrine, and thus to the supplier's liability. In sum, insofar as *Maxton* determined that the component parts doctrine is applicable to claims of the type alleged in the FAC, we respectfully disagree.


### 5. *Respondents' Other Contentions*

Respondents also raise other contentions related to *Maxton* and the trial court's application of that decision. Their principal contention is that the products they supplied to Supreme were necessarily defect-free because they constituted versatile raw materials that were safe when they left respondents' control. They

place special emphasis on comment c to section 5 of the Restatement Third of Torts, which is quoted in *Maxton* and other cases upon which they rely. (*Maxton*, *supra*, 203 Cal.App.4th at p. 90; *Arena*, *supra*, 63 Cal.App.4th at p. 1191.)

Comment c addresses sand, gravel and other materials when they take the form of "basic raw material[s]," and sets forth limitations on their suppliers' liability for design and warning defects when they are integrated into end products. The comment states that such basic raw materials generally do not suffer from design defects, and that their suppliers ordinarily are not required to provide warnings regarding the end products, as that would oblige the suppliers "to develop expertise regarding a multitude of different end products." (Rest.3d Torts, Products Liability, § 5, com. c., p. 134.)[18]

In our view, comment c is inapplicable to the claims asserted in the FAC, as the comment is intended to illuminate section 5, which concerns the liability of a component part supplier "for harm to persons . . . *caused by a product into which the component is integrated . . . .*" (Rest.3d Torts, Products Liability, § 5, italics added.) No such injury is alleged in the FAC. Furthermore, the FAC does not allege that respondents' products were sold to Supreme in the form of "basic" raw

---

[18] Comment c states: "Product components include raw materials. . . . Regarding the seller's exposure to liability for defective design, a basic raw material such as sand, gravel, or kerosene cannot be defectively designed. Inappropriate decisions regarding the use of such materials are not attributable to the supplier of the raw materials but rather to the fabricator that puts them to improper use. The manufacturer of the integrated product has a significant comparative advantage regarding selection of materials to be used. Accordingly, raw-materials sellers are not subject to liability for harm caused by defective design of the end-product. The same considerations apply to failure-to-warn claims against sellers of raw materials. To impose a duty to warn would require the seller to develop expertise regarding a multitude of different end-products and to investigate the actual use of raw materials by manufacturers over whom the supplier has no control. Courts uniformly refuse to impose such an onerous duty to warn." (Rest.3d Torts, Products Liability, § 5, com. c., p. 134.)

27

materials. On the contrary, the FAC alleges that the products were specialized materials that respondents sold for use in the metal casting manufacturing process, and that the products posed known hazards to Ramos when used as intended. Respondents' contention that their products were defect-free would require us to reject the FAC's factual allegations, which we decline to do.[19]

Relying on the "sham pleading" doctrine, respondents contend that certain allegations in the FAC must be disregarded. Under that doctrine, a court may set aside amendments that omit harmful allegations in the original complaint or add allegations inconsistent with the harmful allegations. (*State of California ex rel. Metz v. CCC Information Services, Inc.* (2007) 149 Cal.App.4th 402, 412.) As the mold material suppliers note, appellants' initial complaints alleged that Ramos suffered injuries when exposed to dust from their products while transporting the products, mixing them together to form molds, and breaking the molds to remove the metal casting. The FAC omitted that broad factual allegation, and substituted allegations that Ramos's injuries were due to his exposure to dust from the products when he scooped them out of bags, poured them into containers, and handled them in other ways, independent of any melting, cutting, or other activity

---

[19]     For similar reasons, respondents' reliance on *In re TMJ Implants Products Liability Litigation* (8th Cir. 1996) 97 F.3d 1050 is misplaced. There, the plaintiffs suffered injuries from medical jaw implants, and asserted products liability claims against businesses that supplied materials to the implant manufacturer. (*Id*. at pp. 1052-1053.) In discussing the application of the component parts doctrine, the Eighth Circuit remarked: "Suppliers of versatile materials like chains, valves, sand, gravel, etc., cannot be expected to become experts in the infinite number of finished products that might conceivably incorporate their multi-use raw materials or components." (*Id*. at p. 1057.) As explained above, that remark is inapplicable to the FAC, which does not allege injuries resulting from a finished product into which respondents' materials were incorporated, but from the direct use of those materials as their manufacturers intended.

that transformed them. The mold material suppliers maintain that those amendments constitute "sham" allegations. We disagree.

The "sham pleading" doctrine is inapplicable because the original allegations were not, in fact, harmful to appellants' claims, and there is an adequate explanation for the amendments (*Deveny v. Entropin, Inc.* (2006) 139 Cal.App.4th 408, 426-427). For the reasons discussed above (see B.3 & C.4., *ante*), a product supplier may be required to provide adequate warnings to a worker using its products as the supplier specifically intended, even though that use involves the product's transformation or its combination with products from other suppliers. Appellants' initial allegations were thus not harmful to their claims.[20]

The record further discloses that appellants amended those allegations only because the trial court, in applying *Maxton*, advised them that their claims would fail if Ramos's exposure to dust occurred "in the course of a process that substantially changed [the product]." In response to that advice, appellants made the amendments described above. Under the circumstances, we conclude that

---

[20]	The mold material suppliers suggest that because appellants alleged that their products were integrated into molds, the products must be viewed as component parts of the molds, for purposes of the component parts doctrine. We disagree. The FAC alleges that the mold material suppliers sold or provided their products for a specific use or purpose, namely, the creation and employment of molds during the metal casting process. The component parts doctrine does not shield a supplier from liability when the supplier provides its product for a specific use in a manufacturing process, the hazards of which are created by the use of product as intended by the supplier. (See *Tellez-Cordova, supra,* 129 Cal.App.4th at pp. 579-584 [manufacturer of grinding tools specifically designed to be combined with abrasive disks was obliged to warn users that grinding process produced toxic dust].)

29

there was no "sham pleading." In sum, with the exception of the claim for negligence per se, the FAC stated causes of action not subject to demurrer.[21]

---

[21] In a related contention, the metal suppliers suggest that the FAC contains inconsistent allegations, noting that it describes their products as "specialized metal alloys manufactured and sold . . . for specialized applications," and also states that the products were "not designed to [Supreme's] exact specifications." We see no inconsistency, as a supplier may sell a specialized product intended for a particular manufacturing process without first obtaining specifications for the product's design from one of its buyers.

## DISPOSITION

The judgment of dismissal is affirmed solely with respect to the claim for negligence per se in the FAC, and reversed with respect to the other claims in the FAC. The matter is remanded to the trial court with directions to vacate the orders sustaining respondents' demurrers to the FAC without leave to amend, and to enter a new order overruling the demurrers to the claims in the FAC, with the exception of the claim for negligence per se, to which the demurrers were properly sustained without leave to amend. Appellants are awarded their costs on appeal.

**CERTIFIED FOR PUBLICATION.**


MANELLA, J.


We concur:


EPSTEIN, P. J.


EDMON, J.*

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

31